1
2
3                      UNITED STATES DISTRICT COURT
4              WESTERN DISTRICT OF WASHINGTON AT SEATTLE
5

| | |
|---|---|
| CHRISTOPHER M. BERNARD, individually and on behalf of LAST MILE NATIONAL CITY, LLC, and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br><br> V. <br><br> AMAZON.COM, INC., AMAZON LOGISTICS, INC., AND DOES 1-20, <br><br> DEFENDANTS. | Case No.: <br><br> CLASS ACTION COMPLAINT FOR: <br> I. RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962) <br> II. SHERMAN ACT (15 U.S.C. §§ 1, 2) <br> III. FRAUDULENT FRANCHISE (FEDERAL & STATE) <br> IV. CALIFORNIA UNFAIR COMPETITION LAW (BUS. & PROF. CODE § 17200) — PUBLIC INJUNCTIVE RELIEF <br> V. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING <br> VI. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE <br> VII. FRAUD / FRAUDULENT CONCEALMENT <br> VIII. DECLARATORY JUDGMENT — ARBITRATION CLAUSE UNENFORCEABLE/INAPPLICABLE <br> IX. WASHINGTON CONSUMER PROTECTION ACT (RCW 19.86) — PUBLIC INJUNCTIVE RELIEF <br><br> DEMAND FOR JURY TRIAL |

**INTRODUCTION**

1. Amazon's "Delivery Service Partner" ("DSP") program walks, talks, and profits like a franchise while denying DSP owners the protections of franchise laws. Amazon has constructed

a massive gig-economy scheme that extracts value from these owner-operators while avoiding the legal obligations that come with legitimate franchise relationships.

2. Through a carefully orchestrated pattern of deception, Amazon lures individuals to invest their life savings in what it portrays as an independent business opportunity — promising they can "own your own business" with projected profits of $75,000 to $300,000 per year. In reality, Amazon exercises comprehensive control over virtually every aspect of the operation, systematically extracting value and preventing DSP owners from ever realizing a return on their investment.

3. Mr. Bernard's experience illustrates the DSP scheme. Over 2019–2023, Mr. Bernard scaled his DSP operation to 50 delivery vans and over 100 employees, achieving approximately $1.9 million in profit in 2021, $1.8 million in 2022, and $1.5 million in 2023. In 2024, however, Amazon unilaterally imposed "profit compression" measures that slashed Mr. Bernard's annual profit to around $650,000. Over 2024–2025, Mr. Bernard secured seven qualified, cash-ready buyers offering up to $1.2 million for his DSP business, but Amazon rejected each potential sale without meaningful review. When the seventh buyer advanced to Amazon's final approval stage in May 2025, Amazon abruptly terminated Mr. Bernard's DSP contract without warning or cause — effectively destroying his business — and then offered a token $75,000 "unwind" payment conditioned on Mr. Bernard signing a broad release and nondisclosure agreement.

4. Plaintiffs seek damages and public injunctive relief to stop Amazon's unlawful DSP practices and to restore fair, transparent conditions across the DSP network.

**JURISDICTION AND VENUE**

5. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert federal claims under RICO (18 U.S.C. § 1964(c)) and the Sherman Act

(15 U.S.C. § 15). The Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

6. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants reside in this District and a substantial part of the events giving rise to the claims occurred here (Amazon orchestrated the DSP program from its Washington headquarters).

**PARTIES**

7. Plaintiffs: Christopher M. Bernard is an individual residing in Arizona. From 2019 to May 2025, Mr. Bernard owned and operated Last Mile National City, LLC ("LAMI"), a California limited liability company that functioned as an Amazon DSP in the San Diego, California area until Amazon's wrongful termination of that DSP contract in May 2025.

8. Defendants: Defendant Amazon.com, Inc. is a Delaware corporation with its principal place of business in Seattle, Washington. Defendant Amazon Logistics, Inc. is a subsidiary of Amazon.com, Inc. that operates the DSP program and was the signatory to DSP agreements with Plaintiffs; it is also headquartered in Seattle, Washington. (Defendants Amazon.com, Inc. and Amazon Logistics, Inc. are referred to collectively as "Amazon.")

**CLASS ALLEGATIONS**

9. Class Definition: Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a Class of all persons and entities in the United States who entered into Amazon DSP program agreements from January 1, 2018 to the present and who have been: (i) terminated or non-renewed; (ii) denied Amazon's approval for a sale,

transfer, or assignment of their DSP business; or (iii) subjected to "profit compression" through Amazon's unilateral adjustments of routes, rates, or costs.

10. **Numerosity:** The Class consists of thousands of DSP owners across the United States, making joinder impracticable.

- **Commonality:** There are numerous questions of law and fact common to the Class, including whether Amazon's DSP program is a franchise in substance; whether Amazon's conduct regarding transfer consents, terminations, and profit controls violates franchise laws, unfair competition laws, and antitrust laws; and whether Amazon's standardized misrepresentations and conditioned "unwind" payments constitute fraud or racketeering activity.

- **Typicality:** Mr. Bernard's claims are typical of the Class because they arise from the same course of conduct by Amazon (the DSP program's operation and unwind practices) that affects all Class members.

- **Adequacy:** Mr. Bernard will fairly and adequately represent the interests of the Class. He has no conflicts with Class members and has retained experienced counsel.

- **Rule 23(b)(2):** Amazon has acted on grounds generally applicable to the Class, making final injunctive relief appropriate respecting the Class as a whole (in particular, class-wide injunctive measures to reform the DSP program's practices).

- **Rule 23(b)(3):** Common questions of law and fact predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy given the uniform nature of Amazon's

ROSSI & CO. PC | 616 33RD AVE NW | GIG HARBOR, WA 988335
303.222.0300 | RGR@VIHC.COM

conduct and the relatively limited resources of individual DSP operators compared to Amazon.

**FACTUAL ALLEGATIONS**

A. Amazon's uniform DSP control system (form over substance)

11. Since approximately 2018, Amazon has operated a nationwide program marketing "business opportunities" to entrepreneurs willing to invest capital in delivery operations. Amazon actively recruits participants by promising that they will "own your own business" and achieve substantial profits (Amazon advertises $75,000 to $300,000 in annual profit) with relatively low startup costs.

12. In reality, Amazon exercises comprehensive franchise-level control over DSP operations, effectively dictating how the business is run despite portraying DSPs as "independent." For example, Amazon requires DSPs to adhere to a detailed operating system, including:

- Mandatory Amazon branding and trade dress: DSPs must use Amazon's logos, uniforms, and vehicle color schemes as prescribed by Amazon.

- Exclusive use of Amazon-approved vendors: DSPs are required to purchase or lease vehicles through Amazon-approved fleet management companies, use Amazon-specified insurance, fuel programs, devices, and other suppliers.

- Control over routes and procedures: Amazon unilaterally assigns delivery routes, sets schedules, mandates delivery procedures, and monitors performance metrics via its centralized software and station personnel.

- Oversight of hiring and personnel: Amazon provides required driver training, controls background checks, imposes hiring pipeline requirements (e.g. preferring certain staffing agencies or veterans), and can demand removal of DSP personnel.

- Continuous supervision: Amazon managers and systems closely monitor DSP operations and driver performance in real time, and Amazon can impose corrective action plans or discipline on DSPs based on metrics.

- Despite exerting this significant control and assistance (the hallmarks of a franchise), Amazon deliberately avoids complying with franchise laws— depriving DSPs of statutory protections such as required disclosures, good-cause termination rights, and transfer rights that legitimate franchisees receive. Amazon has never registered the DSP program as a franchise or provided a Franchise Disclosure Document to DSP owners.

B. Mr. Bernard's experience in the DSP program

13. Amazon recruited Mr. Bernard—an experienced operations executive—in 2019 to start a DSP business, touting the opportunity as a chance to run his own profitable delivery company. Mr. Bernard invested his retirement savings and countless hours to build one of Amazon's most successful DSP operations. Over six years, he grew his fleet to 50 vans, hired and managed over 100 employees, and generated substantial

profits (approximately $1.9 million in 2021, $1.8 million in 2022, and $1.5 million in 2023, according to Amazon's own financial summaries).

14. In early 2024, Amazon unilaterally implemented "profit compression" measures across the DSP program—adjusting route assignments, delivery rates, and reimbursement formulas—to artificially cap DSP earnings. These measures reduced Mr. Bernard's annual profit from roughly $1.5–$1.6 million to approximately $650,000 (a drop of more than 50%). The profit compression was part of Amazon's strategy to standardize DSP margins at a lower level, ensuring that DSP owners could not too quickly accumulate wealth or bargaining power.

15. When Mr. Bernard sought to sell his DSP business in 2024–2025, he identified seven qualified, cash-ready buyers willing to pay up to $1.2 million for the business. These prospective buyers came from Amazon's own approved DSP candidate pool (including, for example, a retired military sergeant and a former Amazon logistics manager). All such sales required Amazon's consent to an assignment of the DSP agreement. Amazon systematically rejected each proposed transfer without any meaningful review or explanation, effectively blocking Mr. Bernard from ever monetizing the business he had built.

16. In May 2025, after the seventh buyer became the first candidate to make it through Amazon's vetting and reach the final interview stage, Amazon abruptly terminated Mr. Bernard's DSP contract—without warning, pretext, or cause—just days before the anticipated sale could be completed. This termination extinguished Mr. Bernard's business overnight, denying him the $1.2 million sale proceeds and destroying the enterprise value he had created. Internal Amazon communications corroborate this timing: the final buyer was approved for interviews on May 22, 2025, and Amazon issued Mr. Bernard's termination notice four days later, to take effect by the end of May 2025.

17. Following the termination, Amazon offered Mr. Bernard a token "unwind" payment of $75,000 (plus a $1,000 personal transition payment) on the condition that he sign a broad release of claims and a strict nondisclosure agreement ("NDA") gagging him from discussing the DSP program. Facing no real alternative, Mr. Bernard refused to sign and received no unwind payment. Amazon's coercive "take-it-or-leave-it" separation agreement is a standard practice imposed on terminated DSP owners nationwide, enabling Amazon to silence dissent and conceal the systemic abuses in the DSP program.

C. Pattern of racketeering and ongoing harm

18. Mr. Bernard's experience is not an isolated incident but part of a pattern of racketeering activity and unlawful conduct by Amazon affecting hundreds of DSPs nationwide. Through further investigation and discovery, Plaintiffs are informed and believe they will show that Amazon has, for years:

- **Systematically stonewalled DSP resales:** Amazon routinely rejects or stalls qualified buyers for DSP businesses, effectively preventing DSP owners from selling or exiting on their own terms.

- **Implemented profit "squeezing" across the network**: Amazon has imposed profit compression measures on DSPs throughout the country to limit their profitability and keep them financially dependent.

- **Terminated DSP contracts to snuff out collective action:** Amazon has abruptly terminated DSPs (often without stated cause) when owners attempt to band together, advocate for better terms, or simply seek to capitalize on the value of their businesses.

- **Used coercive NDAs to suppress information:** Amazon conditions any end-of-contract "unwind" payments on signing draconian confidentiality and non-disparagement agreements, thereby muzzling former DSP owners from speaking out about Amazon's practices.

19. Amazon has carried out these practices via interstate electronic communications (email, online portals, and phone communications) directed to DSP owners around the country. In doing so, Amazon made numerous false representations and omissions about the nature of the DSP "business opportunity," the prospects for profit and resale, and the reasons for withholding consents or terminating contracts. These communications, which include uniform misrepresentations and deceptive omissions, constitute acts of mail fraud and wire fraud under 18 U.S.C. §§ 1341 and 1343. Amazon's pattern of fraudulent and extortionate conduct has continued over multiple years and in multiple states, posing a threat of ongoing criminal activity and satisfying the continuity requirement of the Racketeer Influenced and Corrupt Organizations Act (RICO).

COUNT I — RICO (Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), (d))

20. Plaintiffs reallege and incorporate by reference all preceding paragraphs. Amazon's DSP program constitutes an enterprise affecting interstate commerce, and Amazon (through its officers and agents) has conducted and participated in the affairs of that enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) & (5). In particular, Amazon engaged in multiple acts indictable as mail fraud and wire fraud by sending and receiving interstate communications (including emails, electronic portal messages, and phone calls) that contained material misrepresentations and omissions about: (a) the independence and

entrepreneurial nature of the DSP venture; (b) the profitability and financial prospects of operating a DSP; (c) DSP owners' rights to sell or transfer their businesses; and (d) Amazon's degree of control over DSP operations, costs, and profit margins. Amazon disseminated these misrepresentations in a calculated scheme to defraud DSP owners and maintain control over the enterprise.

21. Amazon's racketeering scheme directly and proximately caused injury to Plaintiffs' business and property. Mr. Bernard, for example, suffered the loss of his $1.2 million business sale and the diminution of his business's value due to Amazon's fraudulent scheme and racketeering acts. Plaintiffs' injuries exceed $2.5 million and were the foreseeable result of Amazon's conduct.

22. By virtue of the foregoing, Amazon has violated 18 U.S.C. § 1962(c). Amazon has also conspired to conduct the DSP enterprise through racketeering activity, in violation of 18 U.S.C. § 1962(d), as Amazon's management and affiliates agreed among themselves to implement the above-described fraudulent scheme. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages, together with costs and attorneys' fees, for Amazon's RICO violations.

COUNT II — SHERMAN ANTITRUST ACT (15 U.S.C. §§ 1, 2)

23. Plaintiffs reallege and incorporate all preceding paragraphs. Amazon has monopoly power (and/or a dangerous probability of obtaining monopoly power) in the market for last-mile delivery services in the areas where DSPs operate. Amazon has willfully acquired or maintained that monopoly power through anticompetitive and exclusionary conduct that unreasonably restrains trade, including:

- **Exclusive dealing:** Amazon effectively prohibits DSPs from delivering for any other company, thereby foreclosing potential competitors in local delivery markets and locking up delivery capacity for Amazon's benefit.

- **Tying and forced dealing:** Amazon conditions participation in the DSP program on the use of Amazon-approved vendors and services (for vehicles, insurance, fuel, payroll, etc.), forcing DSPs into transactions that raise rivals' costs and reinforce Amazon's control.

- **Refusal to deal with successors:** Amazon arbitrarily withholds consent to any transfer or sale of a DSP business to otherwise qualified buyers, ensuring that Amazon alone controls who operates and that no outside or competitor influence enters the market.

- **Predatory termination and pricing practices:** Amazon uses its control over routes, rates, and contract termination to appropriate the value created by DSP owners (e.g. terminating an owner just before a sale, then reallocating the territory), thus deterring DSPs from attempting to sell or align with competitors.

24. Amazon's conduct has had substantial anticompetitive effects on commerce. It eliminates potential competition in last-mile delivery (by preventing DSPs from working with or being acquired by any other logistics company), reduces output and innovation (as DSPs cannot freely grow or partner outside Amazon's system), and reinforces Amazon's dominant market position. Amazon's practices constitute unreasonable restraints of trade under Section 1 of the Sherman Act and unlawful monopolization and/or attempted monopolization under Section 2 of the Sherman Act.

1
2
3
4
5
6
7

25. Plaintiffs and Class members have been injured in their business and property by Amazon's anticompetitive conduct (for example, receiving lower payments and being unable to realize the market value of their businesses). Pursuant to 15 U.S.C. §§ 15 and 26, Plaintiffs seek treble damages and the costs of suit, including attorneys' fees, as well as appropriate injunctive relief to restore competition (such as an injunction barring Amazon from enforcing non-compete provisions or unreasonable transfer restraints in the DSP program).

8
9
10

COUNT III — FRAUDULENT FRANCHISE (Violation of Federal and State Franchise Laws)

11
12
13
14

26. Plaintiffs reallege and incorporate all preceding paragraphs. In substance, Amazon's DSP program is an illegal franchise scheme. The DSP relationship meets all elements of a franchise under federal and state law in that:

15
16
17
18
19
20

a)  DSP owners are required to make a substantial investment (tens of thousands of dollars in startup costs, vehicle leases, insurance, etc., much of it paid to Amazon-approved vendors) and to pay ongoing fees/costs dictated by Amazon (including a portion of package revenue effectively returned to Amazon for branded vehicles and insurance).

21
22
23
24

b)  Amazon grants DSPs the right to operate a delivery business associated with Amazon's trademark, and DSPs operate under the "Amazon" brand, using Amazon trademarks, logos, and a business system prescribed by Amazon.

25
26
27

c)  Amazon exerts significant control and provides significant assistance to DSPs' operations, as detailed above (control over routes, methods, uniforms, suppliers,

28

training, performance standards, etc.), far exceeding the control typical in an

independent contractor relationship and consistent with a franchisor-franchisee

relationship.

27. Amazon has unlawfully failed to comply with franchise laws in operating the DSP

program. Amazon never registered the DSP offering as a franchise or provided required pre-sale

disclosures (such as a Franchise Disclosure Document) to DSP participants, in violation of the

Federal Trade Commission's Franchise Rule (16 C.F.R. Part 436) and state franchise statutes.

Amazon also violated franchise relationship laws by terminating the franchise (DSP

agreements) without good cause and by unreasonably withholding consent to transfers of the

franchise. Plaintiffs and Class members who operated DSP franchises have thereby suffered

statutory injuries.

28. As a direct result of Amazon's unlawful franchise practices, Plaintiffs have sustained

damages including the loss of franchise investment and expected business value. In addition to

damages or restitution for monies wrongfully obtained by Amazon, Plaintiffs seek injunctive

relief under applicable franchise laws to prevent Amazon from continuing to operate an

unregistered, unlawful franchise network at the expense of DSP owners.

COUNT IV — CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code

§ 17200 et seq.) — Public Injunctive Relief

29. Plaintiffs reallege and incorporate all preceding paragraphs. Amazon's conduct

constitutes unlawful, unfair, and fraudulent business practices within the meaning of

California's Unfair Competition Law (UCL):

- **Unlawful:** Amazon has violated multiple laws (including the FTC Franchise Rule, state franchise statutes, RICO, and antitrust laws as alleged herein), and each violation of law constitutes a predicate unlawful practice under the UCL.

- **Unfair:** Amazon's DSP program and exit practices are oppressive, unethical, and unscrupulous. Amazon abused its superior bargaining power to impose one-sided terms (such as the unilateral arbitration clause and nondisclosure requirements) and to systematically appropriate the value created by DSP owners, contrary to established public policies favoring fair franchise relationships and competition.

- **Fraudulent:** Amazon's marketing and communications regarding the DSP program were likely to deceive reasonable prospective owners. Amazon misled Plaintiff and others about the true nature of the DSP relationship (masking it as independent ownership when it was essentially a franchise/employment hybrid) and about key facts such as the difficulty of achieving advertised profits and the near-impossibility of selling the business.

30. **Relief Requested (UCL):** Plaintiffs, on behalf of themselves and the Class, seek public injunctive relief under the UCL to protect the public and current/future DSP owners from Amazon's unfair practices. This forward-looking relief includes, among other things, an injunction requiring Amazon to implement transparent and reasonable criteria for approval of DSP transfers, prohibiting Amazon from terminating DSPs without good cause, requiring clear franchise-style disclosures to DSP participants, and barring Amazon from conditioning "unwind" payments on broad releases or NDAs that serve no purpose other than to stifle lawful complaints. Plaintiffs also seek restitution and disgorgement of any ill-gotten gains Amazon obtained from the DSP program, to the extent permitted by law.

1

2    **COUNT V — BREACH OF THE IMPLIED COVENANT OF GOOD FAITH**

3    **& FAIR DEALING**

4

5        31. Plaintiffs reallege and incorporate all preceding paragraphs. Every contract in

6    Washington and California (and all other relevant states) contains an implied covenant of good

7    faith and fair dealing. The DSP agreement was a form contract drafted by Amazon that gave

8    Amazon broad discretionary powers affecting Plaintiffs' rights. Amazon breached the implied

9    covenant by exercising its discretion in bad faith to deprive Plaintiffs of the benefits of the

10   contract. In particular, Amazon:

11

12       • Arbitrarily terminated Mr. Bernard's DSP agreement without cause (and with

13          intentionally ruinous timing), thereby destroying his ability to realize the long-

14          term value of his business.

15

16       • Unreasonably withheld consent to the proposed sale/transfer of Mr. Bernard's

17          DSP business, for the ulterior purpose of preventing him from cashing out and to

18          intimidate other DSPs.

19

20       • Manipulated performance factors (routes, payment rates, etc.) and otherwise acted

21          to ensure that Plaintiffs could not achieve the level of profit or enterprise value

22          that a fair and honest application of the contract would have permitted.

23

24       32. As a direct result of Amazon's bad-faith conduct, Mr. Bernard and the Class were

25   denied the fruits of their contracts (such as the enterprise value of their DSP businesses and the

26   reasonable profits expected). Plaintiffs seek compensatory damages for breach of the implied

27   covenant, in an amount to be proven at trial.

28

1

2  **COUNT VI — INTENTIONAL INTERFERENCE WITH PROSPECTIVE**

3  **ECONOMIC ADVANTAGE**

4

5      33. Plaintiffs reallege and incorporate all preceding paragraphs. Mr. Bernard had

6  valid and existing economic relationships with prospective buyers who were ready and

7  willing to purchase his DSP business for approximately $1.0–$1.2 million. Amazon had

8  knowledge of these prospective sales (which required Amazon's approval). Amazon

9  intentionally interfered with Mr. Bernard's economic expectancies by unjustifiably

10 refusing to approve the qualified buyers and by terminating Mr. Bernard's DSP contract

11 just as a sale was imminent. Amazon's interference had no legitimate business

12 justification; rather, Amazon's motive was to retain control and send a message to other

13 DSPs. Moreover, Amazon's conduct violated established public policies (including those

14 reflected in franchise and antitrust laws) and was independently wrongful beyond the

15 interference itself.

16

17     34. Amazon's intentional and wrongful interference caused the collapse of Mr.

18 Bernard's pending $1.2 million sale and the loss of other future business opportunities.

19 Plaintiffs seek to recover all damages proximately caused by Amazon's tortious

20 interference, including but not limited to the lost sale proceeds and lost enterprise value,

21 as well as any appropriate punitive damages given Amazon's malice and willful disregard

22 of DSP owners' rights.

23

24 **COUNT VII — FRAUD and FRAUDULENT CONCEALMENT**

25

26     35. Plaintiffs reallege and incorporate all preceding paragraphs. Amazon engaged

27 in fraud through misrepresentations and omissions that induced Mr. Bernard and

28

similarly situated individuals to join and remain in the DSP program. The fraudulent acts include:

**Material misrepresentations:** Amazon, through its marketing materials and personnel, falsely represented the DSP program as an opportunity to "be your own boss" with substantial profit potential (touting specific earnings figures) while in fact Amazon intended to tightly control operations and cap profits. Amazon also repeatedly assured DSP owners that they would be able to sell or transfer their businesses, without disclosing that Amazon would routinely veto such sales.

**Concealment of material facts:** Amazon knowingly concealed the true nature of the DSP relationship — specifically, that it functioned like a franchise or employer-employee relationship with onerous controls. Amazon failed to disclose its secret policy of "profit compression" or its unwritten practice of denying transfers and orchestrating terminations to seize value. Amazon further concealed that any offered "unwind" payment at termination would require a gag order, preventing owners from speaking out.

**Intent and reliance:** Amazon made the above misrepresentations and omissions with the intent to induce reliance by prospective and current DSP owners. Mr. Bernard (and reasonable DSP operators in his position) relied on Amazon's representations of independence, profitability, and fair dealing — investing money and effort and continuing to operate in the program — to their detriment.

36. As a result of Amazon's fraud, Mr. Bernard and Class members suffered substantial losses, including lost investments, lost profits, and loss of business goodwill. Amazon's actions were intentional, willful, and undertaken with oppression or malice, thereby entitling Plaintiffs

to rescission of the DSP agreements, compensatory damages, and punitive damages in an amount sufficient to deter such conduct.

**COUNT VIII — DECLARATORY JUDGMENT (28 U.S.C. § 2201) —**
Arbitration Clause Unenforceable/Inapplicable

37. Plaintiffs reallege and incorporate all preceding paragraphs. An actual controversy exists regarding the validity and enforceability of the arbitration clause and class-action waiver in Amazon's standard DSP agreements. Amazon has invoked (or will invoke) this clause to argue that some or all of Plaintiffs' claims must be referred to private arbitration and that Plaintiffs cannot seek relief in this Court. Plaintiffs maintain that the arbitration provision is void, unenforceable, and/or inapplicable for multiple independent reasons, including that:

(a) The arbitration clause was imposed as part of an illegal and unregistered franchise scheme. Because the entire DSP agreement was part of an unlawful contract and against public policy (as alleged in the fraudulent franchise claim), the arbitration provision within it is unenforceable and cannot be used to shield Amazon from judicial scrutiny.

(b) The arbitration clause purports to waive Plaintiffs' right to seek public injunctive relief, but such a waiver is void and unenforceable as a matter of law and public policy. (In California, for example, it is settled that an agreement cannot strip a plaintiff of the right to pursue injunctive relief for the general public's benefit in court.)

(c) The arbitration clause is procedurally and substantively unconscionable under applicable state law (including Washington and California). The DSP agreement was a

non-negotiable contract of adhesion presented by a vastly more powerful party (Amazon) to unsophisticated operators. Its terms are one-sided — for instance, any claims Amazon is most likely to bring (such as non-compete enforcement) are carved out for court, while the DSP's claims must go to arbitration. The clause imposes unfair costs and venue restrictions on DSPs and grants Amazon a repeat-player advantage in the arbitral forum, all of which render the clause unconscionable and unenforceable.

(d) Post-termination disputes and public injunction claims fall outside the scope of the arbitration clause. Amazon's arbitration provision (to the extent one existed in the DSP agreements during the Class Period) governs certain disputes arising from the DSP contract, but Plaintiffs' claims here include Amazon's post-termination misconduct (e.g. the coercive release/NDAs offered after contract termination) and claims for public injunctive relief — neither of which were contemplated to be within the scope of any arbitration agreement. These claims must be decided by a court.

(e) The DSP agreements, and the relationship between Amazon and DSP owners, fall within the transportation worker exemption of the Federal Arbitration Act (FAA), 9 U.S.C. § 1. The DSP business involves the transportation and delivery of goods in interstate commerce (packages that have moved across state and national borders), and DSP owners and their drivers operate as an integral part of Amazon's transportation network. Accordingly, the FAA does not apply to the DSP agreements, and Amazon cannot compel arbitration under the FAA's authority (any arbitration clause would at most be governed by state law, and for the reasons above, is unenforceable under state law).

38. For each of the independent reasons above, Plaintiffs seek a declaratory judgment that Amazon's arbitration clause and class/representative action waiver are unenforceable and/or inapplicable in this case. This declaratory relief will serve to clarify the parties' rights and

obligations and will allow the Court to adjudicate the claims for public injunctive relief, which cannot lawfully be waived or arbitrated.

**COUNT IX — WASHINGTON CONSUMER PROTECTION ACT (RCW 19.86) — Public Injunctive Relief**

39. Plaintiffs reallege and incorporate all preceding paragraphs. Amazon's conduct toward DSPs, as alleged herein, constitutes unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of Washington's Consumer Protection Act (CPA), RCW 19.86.020. Such conduct includes misrepresenting the nature of the DSP program, imposing unconscionable contract terms, and engaging in the unfair methods of competition described above (e.g. exclusive dealing and secret profit suppression). Amazon's practices affected the public interest and have injured the business and property of numerous DSP owners in Washington and nationwide. Plaintiffs (including LAMI, which operated as a DSP in reliance on Amazon's practices) have suffered injury to their business or property as a result of Amazon's CPA violations (for example, loss of business value and profits).

40. Plaintiffs seek injunctive relief under RCW 19.86.090 to end Amazon's unfair or deceptive practices and to prevent continued harm to the public. The requested public injunctive relief includes measures such as requiring Amazon to establish fair criteria and procedures for DSP contract transfers and terminations, prohibiting Amazon from enforcing any contract provisions that violate public policy (including any unlawful waivers of rights or remedies), and ensuring that DSP participants receive truthful information about the program. Such injunctive relief will benefit not only current and future DSP owners, but also competition and the general public in Washington and beyond. In addition, Plaintiffs seek to recover their actual damages caused by Amazon's

CPA violations, trebled up to the statutory maximum, as well as attorneys' fees and costs as permitted by RCW 19.86.090.

### ANTICIPATED ARBITRATION DEFENSE & REQUESTED SEQUENCING

41. Amazon is expected to invoke the arbitration and class waiver provisions in the DSP agreements as a defense to this action. In view of the important public injunctive relief at issue, Plaintiffs request that the Court resolve certain threshold issues at the outset. Specifically, Plaintiffs seek an order determining that their claims for public injunctive relief (Counts IV and IX under the UCL and CPA) are not subject to arbitration and cannot be waived by agreement. Under well-established law, these public-interest claims must proceed in court. Furthermore, to promote efficient resolution, Plaintiffs ask the Court to adjudicate the availability of the requested public injunctive relief before any portions of the case are sent to arbitration. Any individual damages claims deemed arbitrable can be severed and stayed pending the Court's determination of the public injunction claims.

42. Plaintiffs also respectfully request that the Court itself decide the enforceability of the arbitration clause (as sought in Count VIII) before any arbitration is compelled. Given Amazon's extraordinary market power and the starkly adhesive nature of the DSP agreement, this case presents strong grounds for refusing to enforce the arbitration clause on multiple bases (illegality, unconscionability, FAA exemption, etc.). These issues should be decided by the Court. In sum, Plaintiffs ask that the Court retain jurisdiction over the claims seeking public injunctive relief and declaratory relief on arbitrability, resolve those matters as a priority, and only thereafter—if necessary—permit any remaining claims to proceed in arbitration.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, on behalf of themselves and the proposed Class, pray for judgment against Defendants as follows:

A. Certify this action as a class action under Fed. R. Civ. P. 23(b)(2) and 23(b)(3), appointing Mr. Bernard as class representative and Plaintiffs' counsel as class counsel;

B. Award Plaintiffs and the Class damages for the harm caused by Amazon, including treble damages as provided by law (such as treble damages under civil RICO and the Sherman Act);

C. Award restitution and disgorgement to restore monies unlawfully obtained by Amazon through its DSP program, and award any statutory damages or penalties available under federal or state franchise laws;

D. Grant public injunctive relief to put an end to Amazon's unlawful practices and to prevent future harm. Such injunctive relief should include, at a minimum: (i) requiring Amazon to implement transparent, good-faith criteria and procedures for approving the transfer or sale of DSP businesses; (ii) prohibiting Amazon from terminating DSP contracts without good cause or without reasonable notice and opportunity to cure; (iii) requiring Amazon to provide prospective and current DSP owners with disclosures equivalent to those mandated by franchise laws (so that DSPs are informed of the true nature of the relationship and associated risks); and (iv) barring Amazon from conditioning any end-of-contract payments on agreements that waive legal rights or silence the DSP owner (for example, prohibiting the use of NDAs that prevent outgoing DSPs from disclosing unfair practices). The exact terms of such injunction to be fashioned by the Court according to proof;

E. Award attorneys' fees and costs to Plaintiffs as allowed by law (including but not limited to fee-shifting provisions of RICO, the Sherman Act, the UCL/CPA, and other applicable statutes), plus pre-judgment and post-judgment interest at the highest rates permitted by law;

F. Order that the Court (rather than an arbitrator) decide the threshold availability of public injunctive relief in this case, and accordingly retain jurisdiction to adjudicate Counts IV and IX (and any related declaratory relief in Count VIII) prior to any arbitration of other claims. In furtherance of this, enjoin Defendants from attempting to arbitrate the public injunctive relief claims, and stay any arbitration of individual damages claims pending the Court's decision on the public injunction issues; and

G. Grant such other and further relief as the Court deems just and proper, in law or in equity, including any necessary or appropriate declaratory or injunctive relief to fully remedy the wrongs alleged herein.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated this 6th day of August 2025.

ROSSI & CO, P.C.

s/_____
Ronald G. Rossi
WSBA 54720
Admitted 9th Cir. U.S. Dist. WD WA

RICO, SERMAN ACT, FRAUDULENT FRANCHISE, CA UNFAIR COMP., FRAUD,

ROSSI & CO. PC | 616 33RD AVE NW | GIG HARBOR, WA 988335
303.222.0300 | RGR@VIHC.COM